

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHRIESTARNA JOHNSON, Individually )
and as Special Administrator of the )
Estate of CHRISTOPHER JOHNSON, Deceased,)
)
Plaintiff )
) No. 06 C 4733
v. )
) The Honorable William J. Hibbler
UNITED STATES OF AMERICA, )
)
Defendant. )

## MEMORANDUM OPINION AND ORDER

In February 2003, Christopher Johnson died at the Veterans Administrative Hospital in Chicago. Johnson's daughter, individually and as administrator of Johnson's estate, sued the United States, which controlled and managed the Hospital, alleging that the Hospital committed medical malpractice when it failed to complete a diagnostic test ordered by Johnson's doctor. Chriestarna Johnson moves for summary judgment.

### I. Factual Background

In February 2003, Johnson underwent hernia repair surgery at the VA Hospital. (Pl. 56.1(a) St. ¶ 14). Around 1:40 a.m., the night after the surgery, Johnson's blood pressure dropped to 100 over 67, a significant departure from his baseline blood pressure of 155 over 99. (Pl. 56.1 St. ¶ 21; Prinz Dep. at 69-70).[1] Just before 4:00 a.m., Johnson complained of nausea, dizziness and sweating.

---

[1] Defendant objects to the word "significant," suggesting that its expert, Dr. Richard Prinz never agreed that a difference of 55 mm Hg in the systolic pressure and a difference of 32 mm Hg in the diastolic pressure was significant. The Mayo Clinic notes that: "a sudden fall in blood pressure can be dangerous. A change of just 20 mm Hg — a drop from 130 systolic to 110 systolic, for example — can cause dizziness and fainting when the brain fails to receive an

1

(Pl. Ex. L at CJ 20). A few minutes later, a nurse recorded a blood pressure of 79 over 49, though she used an arm cuff for an obese patient, which may have skewed the reading. (Pl. Ex. L at CJ 30; Ksycki Dep. at 28-33). When Johnson's blood pressure was retaken with a proper sized cuff, Dr. Ksycki measured Johnson's blood pressure at 110 over 50, which is substantially lower than Johnson's baseline blood pressure. (Ksycki Dep. 31-33, 56-58). Dr. Ksycki ordered increased IV fluids, in part because of Johnson's low blood pressure. (Ksycki Dep. at 35).

An hour later, Johnson's blood pressure was 90 over 60, his pulse rate was 90 beats per minute, and his respiratory rate was 20 breaths per minute. (Pl. St. ¶ 25). Dr. Ksycki, who treated Johnson, and Defendant's expert, Dr. Prinz, both admitted that Johnson's readings could indicate possible hemorrhaging. (Ksycki Dep. at 58-61; Prinz Dep. at 72-77). Hemorrhaging would be within the differential diagnosis for a patient with significantly lower than baseline blood pressure and high pulse rate. (Sturgeon Dep. at 33-34).

By 7:00 A.M., physicians treating Johnson ordered a complete blood count (CBC), *stat* (immediately). (Pl. St. ¶ 27). Hospital personnel never performed the test. (Pl. St. ¶ 27).

Just before 10:00 A.M., Johnson's blood pressure had risen to 152/92. (Def. 56.1(b)(3)(C) St. ¶ 10). Around 10:00 A.M., hospital personnel had discontinued the IV and prepared to discharge

---

adequate supply of blood. And big plunges, especially those caused by uncontrolled bleeding, severe infections or allergic reactions can, be life-threatening." *MayoClinic.com*, http://www.mayoclinic.com/health/low-blood-pressure/DS00590/DSECTION=causes (last visited October 8, 2008). While the Court must draw all *reasonable* inferences in the light most favorable to the non-moving party, the Defendant's suggested inference that a 55 mm Hg drop in systolic blood pressure is not "significant" merely because their expert refused to utter those magic words simply is not reasonable. If Dr. Prinz wished to testify that a plunge nearly three times greater than one described by the Mayo clinic as "dangerous" is not significant, he could have stated so clearly. He did not, and the Court shall not draw such an inference. Defendant's denial of Plaintiff's statement of fact reeks of gamesmanship and has no place in a summary judgment motion.

2

Johnson. (Pl. St. ¶ 30). Just after 1:00 P.M., hospital staff found Johnson lying on the floor, in his own urine, but awake and responsive. (Pl. Ex. L at CJ 26). Johnson told the staff that he was "cold and clammy, sweating, and passed out." (Pl. Ex. L at CJ 26). He also told the staff that he felt dizzy when he gets up. (Pl. Ex. L at CJ 26). His blood pressure was 152/92. (Pl. Ex. L at CJ 26).

By 2:50 P.M., Johnson's blood pressure had fallen again. Two readings, taken roughly five minutes apart measured his blood pressure at 92 over 50 and 104 over 47. (Ksycki Dep. at 60). Johnson's pulse rate was 103 and his respiratory rate was 42. (Ksycki Dep. at 61). Johnson's treating doctors and doctors who reviewed the medical file agreed that significantly low blood pressure and a tachycardic pulse rate were consistent with blood loss. (Ksycki Dep. at 60-62; Sturgeon Dep. at 30-32; Gleischman Dep. at 91-92; Teresi Dep. at 55-56).

An hour later, Johnson's vital signs had not improved. His pulse was 108; his blood pressure was 90 over 60; and his respiratory rate was 42. (Pl. St. ¶ 34).

At 4:30, the hospital called Dr. Miguel Teresi; Johnson's blood pressure had fallen to 80 over 50 and his pulse had risen to 120, and he was tachypneic, restless, diaphoretic, and hyperventilating. (Pl. St. ¶ 35). Shortly thereafter, Johnson died. (Pl. Ex. L at CJ 29).

Both the Plaintiff and the Defendant hired experts to testify on behalf of their clients. The Hospital's expert, Dr. Prinz, submitted an expert report in which he opines that the Hospital's failure to complete the CBC was not the cause of Johnson's death. (Def. Ex. 2 (Prinz Report)). Dr. Prinz bases his opinion on the fact that he believes Johnson's hemorrhaging could have begun at one of two points in the sequence of events narrated above: shortly after the operative procedure or after the episode that left Johnson unconscious on the floor, which Dr. Prinz describes as a "major fall." (Prinz Report). Thus, Prinz concludes that "it is not possible to say whether a CBC obtained before

3

one of the possible times for bleeding would have occurred could have been helpful in identifying hemorrhage." (Prinz Report).

## II. Standard of Review

Summary judgment should be granted only if there is "no genuine issue as to any material fact" and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether a material fact exists, a court construes all facts in favor of the non-moving party and draws all reasonable inferences in favor of that party. *Kelbanowski v. Sheahan*, 540 F.3d 633, 637 (7th Cir. 2008). Although it is not a court's role to weigh the evidence or resolve conflicts in resolving summary judgment motions, a non-moving party must show there is evidence upon which a reasonable trier of fact could find for it. *De La Rama v. Illinois Dept. Of Human Serv.*, 541 F.3d 681, 685 (7th Cir. 2008).

## III. Discussion

The FTCA allows a person injured by the negligent or wrongful act of government employees to recover for personal injury where the United States, if a private person, would be liable for the act in accordance with the law of the place where the act occurred. *Donais v. United States*, 232 F.3d 595, 598 (7th Cir. 2002). Thus, Illinois law concerning medical malpractice claims governs this dispute.

To support a medical malpractice claim in Illinois, a plaintiff must prove: 1) the standard of care against which the medical professional's conduct must be measured; (2) the defendant's negligent failure to comply with that standard; and (3) that the defendant's negligence proximately

4

caused the injuries. *Johnson v. Loyola University Med. Ctr.*, 893 N.E.2d 267, 272 (Ill. App. Ct. 2008). Here, the Hospital concedes that the care which Johnson received fell below the relevant standard of care (Prinz Dep. 57-59), and the only issue is whether the Hospital's negligence proximately caused Johnson's death.

Despite the fact that the Court is faced with the competing opinions of the parties' experts, the Plaintiff argues that she is entitled to summary judgment. In support, the Plaintiff hints at some of the facts that call into question Dr. Prinz's conclusions: the 10:00 a.m. readings were taken while Johnson received IV fluids; several doctors agreed that the repeated, abnormally low blood pressure readings taken throughout the day were consistent with hemorrhaging; the autopsy confirms the cause of death as hemorrhage from the surgical wound; there is no evidence in the record the wound ruptured or required resuturing; Johnson was cold and clammy; and several witnesses described him as experiencing symptoms consistent with blood loss. Therefore, the Plaintiff argues, the medical evidence is so one-sided that no reasonable fact-finder could rely upon Dr. Prinz's testimony.

An "expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Weigel v. Target Stores*, 122 F.3d 461, 469 (7th Cir. 1997); *Bragdon v. Abbott*, 524 U.S. 624, 653, 118 S. Ct. 2196, 141 L.Ed. 2d 540 (1998) (expert testimony must have "traceable, analytic basis in objective fact" before considered on summary judgment); *Mid-State Fertilizer Co. v. Exchange Nat'l Bank of Chicago*, 877 F.2d 1333, 1339 (7th Cir. 1989) (disregarding the affidavit of an expert declaration that did not rest on a sound foundation). The Seventh Circuit has held that an expert opinion that fails to reveal "any seeds of justification" is not a bar to summary judgment. *Weigel*, 122 F.3d at 469. An expert cannot simply state that he based his conclusion "upon his education and experience as a Clinical Psychologist . . . and his treatment" without any reference

to underlying facts or the analytic process employed. *Id.* at 469. Similarly, the Seventh Circuit refused to overturn a court's summary judgment order rejecting an expert opinion that not only was unsupported by facts but also made no sense. *Mid-State Fertilizer Co.*, 877 F.2d at 1339-1340.

Despite the Seventh Circuit's position that an expert report must supply the basis for its opinion, even brief expert reports will suffice at the summary judgment stage. *Vollmert v. Wis. Dept. Of Trans.*, 197 F.3d 293, 300-01 (7th Cir. 1999); *Patton v. MFS/Sun Life Fin. Distributors, Inc.*, 480 F.3d 478, 487 (7th Cir. 2007); *Abdullah v. City of Madison*, 423 F.3d 763, 772 (7th Cir. 2005). Expert report must supply the basis for the opinion, but need not "give a primer on why the facts allow the expert to reach [the] conclusion . . . "or answer all potential challenges to the opinion in order for [the] opinion to be given weight in a summary judgment proceeding." *Vollmert v. Wis. Dept. Of Trans.*, 197 F.3d 293, 300-01 (7th Cir. 1999). A party who disagrees with the conclusion drawn by an expert may present its own evidence to rebut it. *Id.* The sheer quantity of evidence on one side or inconsistencies in the evidence are not appropriate considerations in resolving summary judgment motions. *Patton*, 480 F.3d at 489 (noting that inconsistencies in expert's written letters did not compel a factfinder to disregard expert opinion); *Abdullah*, 423 F.3d at 763 (weight of evidence and number of witnesses in favor of defendant not dispositive on summary judgment).

In this case, Dr. Prinz's opinion covers a scant paragraph in a two-page report. To be sure, Dr. Prinz's opinion is not a road-map that sets forth all of the facts on which his opinion is based or answers all challenges to his conclusion. He glosses over several facts that undermine his opinion (such as those pointed out by the Plaintiff) and leaves many questions unanswered. For example, what other medical conditions, besides post-operative bleeding, could have caused consistently and

abnormally low blood pressure for nearly 12 hours?[2] Could the fact that Johnson received IV fluids temporarily affect his blood pressure? If so, would a subsequent drop in blood pressure once hospital staff discontinued the IV have bolstered a conclusion that Johnson suffered post-operative hemorrhaging? Would a wound consistent with a fall be distinguishable in appearance from a wound consistent with post-operative hemorrhaging? What kind of impact would be necessary to cause hemorrhaging in sufficient amount to kill Johnson within a few hours of a fall? Was the amount of blood lost by Johnson consistent with hemorrhaging that might have begun recently?

But while Dr. Prinz's opinion that a CBC would not necessarily have identified Johnson's hemorrhaging (and thus saved his life) is scant it is not so threadbare that the Court will deem it too conclusory or uninformative to be given any weight. Dr. Prinz sets forth the rationale underpinning his opinion: that Johnson's hemorrhaging could have been caused either by the surgical procedure or a post-operative fall. It sets forth some of the medical evidence on which Dr. Prinz bases his opinion: that Johnson's blood pressure, pulse and respiratory rate were within normal ranges around 10:00 a.m., which is inconsistent with hemorrhaging; that hospital personnel who treated Johnson throughout the day described him as alert and oriented without major signs of stress; and that he was able to produce urine. In Dr. Prinz's deposition, he points to medical evidence from which he concludes that Johnson suffered a fall.

---

[2] Dr. Prinz did testify that myocardial infarction, heart attack, pulmonary embolus, or infection could have caused a drop in blood pressure. (Prinz. Dep. at 65, 73). Dr. Prinz, rather reluctantly, also admitted that in this case none of these conditions in fact did cause Johnson's drop in blood pressure. (Prinz Dep. at 65, 73-74). Of course, then, the question remains whether any other medical conditions that Dr. Prinz has yet to exclude as potential medical explanations for Johnson's drop in blood pressure exist.

The medical evidence and unanswered questions alluded to by the Plaintiff certainly might convince a factfinder to give the opinion less weight, but they do not compel a reasonable factfinder to disregard Dr. Prinz's medical opinion. The appropriate time, however, to raise these and other questions that call into question Dr. Prinz's opinion is during trial, and not during summary judgment. Dr. Prinz's report treads perilously close to those identified by the Seventh Circuit as lacking "any seeds of justification." In short, the Court is not left totally in the dark about the facts and medical reasoning that support Dr. Prinz's medical opinion.

Given that Dr. Prinz's report directly addresses the issue of causation, summary judgment is not appropriate and the Court DENIES Plaintiff's motion.

IT IS SO ORDERED.

10/16/08
Dated

Hon. William J. Hibbler
United States District Court

8